# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

STATE OF CALIFORNIA, ex rel.
Edmund G. Brown, Jr.,
*Plaintiff-Appellant,*

v.

SAFEWAY, INC., a Safeway
Company doing business as Vons;
ALBERTSON'S, INC.; RALPHS
GROCERY COMPANY, a division of
the Kroger Company; FOOD 4 LESS
FOOD COMPANY, a division of the
Kroger Company; VONS COMPANIES
INC., an indirect, wholly owned
subsidiary of Safeway, Inc,
*Defendants-Appellees,*

No. 08-55671
D.C. No.
2:04-cv-00687-AG-
SS

STATE OF CALIFORNIA, ex rel.
Edmund G. Brown, Jr.,
*Plaintiff-Appellee,*

v.

SAFEWAY, INC., a Safeway
Company doing business as Vons;
ALBERTSONS, INC.; RALPHS GROCERY
COMPANY, a division of the Kroger
Company; FOOD 4 LESS FOOD
COMPANY, a division of the Kroger
Company; VONS COMPANIES INC.,
an indirect, wholly owned
subsidiary of Safeway, Inc.,
*Defendants-Appellees.*

No. 08-55708
D.C. No.
2:04-cv-00687-AG-
SS

OPINION

11925

Appeal from the United States District Court
for the Central District of California
Andrew J. Guilford, District Judge, Presiding

Argued and Submitted
October 8, 2009—Pasadena, California

Filed August 17, 2010

Before: Harry Pregerson, Stephen Reinhardt and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Reinhardt;
Partial Concurrence and Partial Dissent by Judge Wardlaw

## COUNSEL

Edmund G. Brown Jr., Attorney General for the State of California; Kathleen E. Foote, Senior Assistant Attorney General; Barbara M. Motz, Supervising Deputy Attorney General; Cheryl L. Johnson, Deputy Attorney General, and Jonathan M. Eisenberg, Deputy Attorney General, Los Angeles, California, for the plaintiff-appellants/cross-appellees.

Alan B. Clark, Peter K. Huston, Los Angeles, California, and Jeremy P. Sherman, Chicago, Illinois, for respondent-appellees/cross-appellants Safeway Inc. and the Vons Companies, Inc.

Jeffrey A. LeVee, Craig E. Stewart, and Kate Wallace, Los Angeles, California, for respondent-appellee/cross-appellant Albertson's, Inc.

Robert B. Pringle, San Francisco, California, for respondent-appellees/cross-appellants Ralphs Grocery Company and Food 4 Less Food Company.

Robin S. Conrad, Shane B. Kawka, Washington, District of Columbia, for amicus curiae Chamber of Commerce of the United States.

Charles I. Cohen, Jonathan C. Fritts and David R. Broderdorf, Washington, District of Columbia, for amici curiae Chamber of Commerce of the United States and Council on Labor Law Equality.

Jeffrey A. Berman, Los Angeles, California, for amicus curiae Employers Group.

Robert M. McKenna, Attorney General of Washington; and Mark O. Brevard, Assistant Attorney General, Seattle, Washington; and Nancy H. Rogers, Attorney General of Ohio; and Jennifer L. Pratt, Chief, Antitrust Section, Columbus, Ohio for amici curiae Arizona, Connecticut, Delaware, Maryland, Massachusetts, Mississippi, Missouri, Montana, Nevada, Ohio, Oklahoma, Oregon, Tennessee, Washington and West Virginia.

Nicholas W. Clark, Washington, District of Columbia, for amicus curiae United Food and Commercial Workers International Union.

Michael D. Four, Los Angeles, California, for amici curiae UFCW Local Unions 135, 324, 770, 1036, 1167, 1428 and 1442.

Andrew D. Roth, Washington, District of Columbia, for amici curiae United Food and Commercial Workers International Union, UFCW Local Unions 135, 324, 770, 1036, 1167, 1428 and 1442, Change to Win and AFL-CIO.

Patrick J. Szymanski, Washington, District of Columbia, for amicus curiae Change to Win.

Jonathan P. Hiatt, Washington, District of Columbia, for amicus curiae AFL-CIO.

## OPINION

REINHARDT, Circuit Judge:

Our antitrust regime is the embodiment of Congress's judgment that, with rare and specific exceptions, free competition for customers between firms protects and benefits the public by increasing efficiency and output, lowering prices, and improving the quality of the products and services available.[1] Our labor laws exist to reduce strife between workers and employers and to ensure that workers are able to organize, and, by organizing, to promote their interests and protect their rights.[2] These laws are not antithetical, but have been harmonized by Congress and the courts.

---

[1] *See Apex Hosiery Co. v. Leader*, 310 U.S. 469, 493 (1940) ("The end sought [by Congress in passing the Sherman Act] was the prevention of restraints to free competition in business and commercial transactions which tended to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services, all of which had come to be regarded as a special form of public injury"); *see also Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 180 (2006) ("Interbrand competition, our opinions affirm, is the primary concern of antitrust law." (citations and internal quotation marks omitted)); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993) ("The purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market. The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself. It does so not out of solicitude for private concerns but out of concern for the public interest."); *City of Lafayette, La. v. La. Power & Light Co.*, 435 U.S. 389, 398 (1978) (In passing the Sherman Act, Congress "sought to establish a regime of competition as the fundamental principle governing commerce in this country.").

[2] *See, e.g.*, 29 U.S.C. § 102 (titled "Public policy in labor matters declared," and stating "[w]hereas under prevailing economic conditions,

In this case, the three largest supermarket chains in Southern California agreed to share profits amongst themselves and with a fourth supermarket chain during the indeterminate term of, and for a short period after, an anticipated labor dispute. The central issue here is whether a profit sharing agreement that would ordinarily violate the antitrust laws is excused from compliance under the nonstatutory labor exemption because it constitutes an economic weapon used by the employers in their efforts to prevail in a labor dispute. Alternatively, defendants contend that because the agreement will aid them in achieving lower labor costs, it results in a procompetitive benefit that outweighs its anticompetitive effects, and thus is not unlawful under Section 1 of the Sherman Act. *See* 15 U.S.C. § 1. The defendants also contend that the agreement is not anticompetitive because it may be of relatively short duration and because defendants between them control less than a 100% share of the market. Although we devote a considerable part of our discussion to explaining why the profit sharing agreement is anticompetitive, we doubt that anyone would seriously suggest that the agreement was lawful if it had been adopted simply in order to benefit defendants economically, and there had been no impending labor dispute. The most important part of our discussion, therefore, deals with the central issue: whether the fact that defendants' agreement was designed for use as an economic weapon in a labor

developed with the aid of governmental authority for owners of property to organize in the corporate and other forms of ownership association, the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment, wherefore, though he should be free to decline to associate with his fellows, it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment"; *First Nat. Maint. Corp. v. N.L.R.B.*, 452 U.S. 666, 674 (1981) ("A fundamental aim of the National Labor Relations Act is the establishment and maintenance of industrial peace to preserve the flow of interstate commerce.").

dispute changes or excuses the anticompetitive nature of the agreement.

## I.

Defendants Albertson's, Vons (for which defendant Safeway, Inc. is the parent company), Ralphs and Food 4 Less are supermarket chains operating in Southern California. Ralphs, Albertson's and Vons, which are the three largest supermarket chains in that region, and possess a commanding share of the market, had a collective bargaining agreement with various unions affiliated with the United Food and Commercial Workers ("UFCW") that was set to expire on October 5, 2003. Food 4 Less had a separate contract with the same unions that did not expire until four months later, the successor to which was to be reached through a separate negotiation. In July and August 2003, Ralphs, Albertson's and Vons agreed with the unions that the three chains would act as a multiemployer bargaining unit for the purpose of negotiating a successor to their expiring contract. Among other goals, these firms sought terms that would decrease the costs of labor, in particular the cost of providing health coverage to workers.

In anticipation of the unions using whipsaw tactics (in which unions strike or picket only one employer in a multiemployer bargaining unit), Ralphs, Albertson's and Vons, along with Food 4 Less, entered into a Mutual Strike Assistance Agreement (hereinafter, the MSAA). In the MSAA, the four supermarket chains agreed that they would all lock out their union employees within 48 hours of a strike against any one or more of them, a traditional tactic in labor disputes. More significantly, in what defendants term a "revenue sharing provision," the MSAA provided for the sharing of profits during the strike, regardless of its length. This provision stated that, in the event of a lockout or strike, any firm that earned revenues above its historical share of the combined revenues of all four firms would redistribute 15% of those surplus revenues

among the other chains according to a fixed formula. According to Richard Cox, a Safeway (Vons) vice president who helped draft the MSAA, the 15% number was intended as an estimate of the profit that a chain would earn on increased sales without having to increase fixed costs. The purpose of the profit sharing provision was to maintain each defendant's pre-labor dispute market share. Food 4 Less was included in the agreement to share profits despite being outside the multiemployer bargaining unit and despite having a separate collective bargaining agreement with the UFCW-affiliated unions that was expiring at a different time, the successor to which was to be negotiated separately. Additionally, the chains agreed to share profits according to the same formula in the event that Food 4 Less was struck during its later, separate collective bargaining process. Under the terms of the agreement, profit sharing was to continue for two full weeks after the termination of any strike or lockout. Thus, in the event that a strike or lockout involving the three largest supermarket chains in Southern California caused members of the public to patronize Food 4 Less, one of the next largest supermarket chains in the region, Food 4 Less was required to share its extra profits with the strike-bound firms.

The profit sharing agreement covered 859 Ralphs, Albertson's and Vons stores in Southern California, as well as 101 Food 4 Less stores that operated in the same area. According to data collected by AC Nielsen, Albertson's, Ralphs, Vons, and Food 4 Less accounted for at least 55% and as much as 64% of the Los Angeles-Long Beach metropolitan area market during every quarter of 2003-04, including the quarters during which the labor dispute occurred, and between 66% and more than 75% of the San Diego metropolitan area market during the same period. *See* Declaration of Thomas R. McCarthy, exs. 3A-3D. A fair estimate of the four chains' collective market share of the Los Angeles-Long Beach portion of the Southern California market both before and after the strike would appear to be at least 60% and of the San Diego area portion at least 70%.

On October 11, 2003 the unions struck local Vons stores. Pursuant to their agreement, Ralphs and Albertson's (but not Food 4 Less) locked out their union employees the next day. The unions initially picketed all three supermarket chains but stopped picketing Ralphs stores on October 31, 2003. The strike received extensive news coverage, including a front page story in the Los Angeles Times on November 1, 2003 that reported the existence of a plan for the chains to share the financial burden of the strike. *See* Nancy Cleeland and Melinda Fulmer, *In Tactical Move, Union Pulls Pickets from Ralphs*, L.A. Times, Nov. 1, 2003, at A1. Selective picketing of Vons and Albertson's stores continued until February 2004, when a new labor contract was reached and the strike ended. Pursuant to the profit sharing agreement, Ralphs and Food 4 Less paid Vons and Albertson's approximately $142 million for the strike period, and $4.2 million for the two-week period following the strike.

California filed a lawsuit against defendants, alleging that by entering into the profit sharing agreement, defendants had engaged in an unlawful combination and conspiracy in restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act. The state sought a declaratory judgment that the profit sharing agreement violates Section 1, as well as attorney fees.

Defendants contended, among other defenses, that the nonstatutory labor exemption applied, and the district court bifurcated the case to allow defendants to seek a ruling as to its applicability. Ultimately, the court denied defendants' summary judgment motion based on their nonstatutory labor exemption contention. *See California v. Safeway, Inc.*, 371 F. Supp. 2d 1179 (C.D. Cal. 2005). Defendants unsuccessfully moved the trial court to certify the nonstatutory labor exemption issue for interlocutory appeal, and unsuccessfully tried to appeal directly to this court. After this, California filed a summary judgment motion seeking a ruling that the profit sharing agreement was either a per se violation of § 1 or was unlawful

under an abbreviated rule-of-reason, "quick look" analysis. The district court denied California's motion, and subsequently denied its motion to certify the order for interlocutory appeal. It also denied defendants' renewed motion for summary judgment based on the nonstatutory labor exemption. Final judgment was entered after a stipulation in which California agreed not to pursue judgment under a full rule of reason analysis, and defendants withdrew all affirmative defenses except for the claim that the profit sharing agreement was protected from antitrust review by the nonstatutory labor exemption. *See State of California v. Safeway et al.*, No. CV 04-0687 (C.D. Cal., filed Mar. 27, 2008). Both California's appeal and defendants' cross-appeal were timely. The appeal is not moot because the case falls squarely within the rule for situations that are "capable of repetition, yet evading review." *See United States v. Brandau*, 578 F.3d 1064, 1067 (9th Cir. 2009).

## II.

We must determine first whether defendants' profit sharing agreement violates § 1 of the Sherman Act, which bans agreements or combinations that act as unreasonable restraints on interstate commerce. *See State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). Defendants entered into an agreement to share profits. Such agreements have traditionally been held to be anticompetitive because they remove the incentive to engage in competitive behavior. Defendants have three principal contentions as to why their profit sharing agreement is different: first, that their profit sharing is for a limited, if indefinite period; second, that their agreement does not include 100% of the participants in the market; and third, by way of response to plaintiff's prima facie case, that by aiding them to prevail in the labor dispute and achieve their goal of lowering wages and benefits paid to their employees, the agreement aids competition in the Southern California market. It is obvious intuitively and from a rudimentary knowledge of economics, as well as from a reading of the case law, that neither the agree-

ment's limited duration nor its failure to include the fragmented group of other firms operating in the market could do more than *reduce* the ordinary anticompetitive effects of such agreements. Certainly these factors would not *eliminate* such effects. In this section we confirm that conclusion by analyzing the details, logic, and circumstances of the particular profit sharing agreement, including its relationship to the anticipated strike. Our answer is still the same in every respect. The agreement's effect is necessarily anticompetitive, and, like any other profit sharing agreement of limited duration among firms that control less than 100% of the market, the anticompetitive effects might be reduced to some extent but they certainly would not be eliminated.

Accordingly, the only real question is whether the agreement, patently anticompetitive on its face, should be held valid because of its role as an economic weapon for the defendants in a labor dispute. This question has two different aspects: first, whether aiding employers in winning labor disputes and, as a result, in reducing the wages and benefits they pay their employees, constitutes a procompetitive benefit that would overcome the anticompetitive effects of their conduct and render their otherwise anticompetitive conduct lawful under the Sherman Act; and second, whether, because of its role in a labor dispute, the profit sharing agreement is exempt from the antitrust laws under the nonstatutory labor exemption. We address the first of these questions at the end of this section. The second is the subject of the subsequent and separate section, Section III.

## A.

**[1]** The basic method of analysis for determining whether an agreement is an unreasonable restraint on trade such as violates § 1 of the Sherman Act is rule of reason review, in which a court looks to factors such as "specific information about the relevant business," "the restraint's history, nature, and effect," and "[w]hether the businesses involved have mar-

ket power," with the purpose of "distinguish[ing] between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *See Leegin Creative Leather Products, Inc. v. PSKS, Inc*, 551 U.S. 877, 885-886 (2007).

**[2]** Full rule of reason review is data-intensive, and, consequently, expensive for litigants; also, it consumes large amounts of courts' time and resources. *See Arizona v. Maricopa County Medical Soc.*, 457 U.S. 332, 344 & n.14 (1982). For these reasons, as well as to provide guidance to the business community, *see Continental T.V., Inc., v. GTE Sylvania Inc.*, 433 U.S. 36, 50 n.16 (1977), courts have developed summary methods of identifying § 1 violations in circumstances in which such violations are discernible without a full rule of reason analysis: per se review and quick look review. Per se analysis examines whether prior judicial experience with the type of restraint at issue is sufficient to allow a determination that it would always or almost always tend to restrict competition and decrease output. *See Leegin*, 551 U.S. at 886. The focus of the inquiry is on accumulated data from prior decisions: an agreement may be declared unlawful with no further analysis, simply by virtue of its being of a type that courts have previously determined to have "manifestly anticompetitive effects," and no "redeeming virtue." *Id.*

In contrast, an arrangement is violative of § 1 under a quick look approach when "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *California Dental Ass'n v. F.T.C.*, 526 U.S. 756, 770 (1999). Quick look review is not necessarily based on a history of rule of reason adjudications; rather, it asks whether "a great likelihood of anticompetitive effects can easily be ascertained" by examining the restraint, and considering defendants' justifications of it. *See id.*; *see also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 1911a, p. 267 (3d. ed. 1996) (Quick look review "is usually

best reserved for circumstances where the restraint is suffi-
ciently threatening to place it presumptively in the *per se*
class, but lack of judicial experience requires at least some
consideration of proffered defenses or justifications.").[3]

California contends that defendants' profit sharing arrange-
ment violates § 1 under both per se and quick look review. Its
assertion that the agreement strongly resembles arrangements
that prior cases have found violative of § 1 is correct,
although the particular circumstances of the restraint in ques-
tion do differ from the circumstances relating to the profit
sharing arrangements examined in those earlier cases. It is,
however, unnecessary for us to determine whether such dif-
ferences are sufficiently material to cause us to refrain from
holding that defendants' profit sharing agreement was illegal
under a strict per se analysis, because the agreement was
plainly illegal under a quick look or, more accurately, a com-
bined or mixed form of review. "[A] great likelihood" that
defendants' profit sharing arrangement produced "anticompe-
titive effects" is manifest, *Cal. Dental Ass'n*, 526 U.S. at 770,
and defendants offer no plausible procompetitive benefits
such as would overcome or neutralize those effects so as to
require full rule of reason analysis.

---

[3]Inherent in the summary nature of quick look and per se analysis is the
possibility that a restraint that would survive a full rule of reason analysis
in a particular case will nonetheless be invalidated: "[f]or the sake of busi-
ness certainty and litigation efficiency, we have tolerated the invalidation
of some agreements that a fullblown inquiry might have proved to be rea-
sonable." *See Maricopa County Medical*, 457 U.S. at 344. The ultimate
inquiry in both analyses is establishing a sufficiently high likelihood of
anticompetitive effect to justify foreclosing, in the name of certainty and
efficiency goals, the possibility that a more in depth review would reveal
that a restraint was on balance benign or even beneficial. *See Major
League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 340 (2d
Cir. 2008) (Sotomayor, J., concurring) (quick look and per se "methods of
analysis are reserved for practices that 'facially appear [ ] to be one[s] that
would always or almost always tend to restrict competition and decrease
output.' " (quoting *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441
U.S. 1, 19-20 (1979) (alterations in original)).

**[3]** Although the parties briefed the case on the traditional view that the two summary forms of review are separate and unrelated, and we discuss the questions they posed separately to some extent, we ultimately consider the lawfulness of the agreement in light of the Supreme Court's recent explanation that "our categories of analysis are less fixed than terms like 'per se,' 'quick look' and 'rule of reason' tend to make them appear." *Id.* at 779. According to Justice Souter, writing for the Court, "what is required . . . is an enquiry meet for the case, looking to the circumstances, details, and logic of a restraint," with the object of determining "whether the experience of the market has been so clear, or necessarily will be, that a confident conclusion" can be drawn that the "principal tendency" of an agreement is anticompetitive. *Id.* at 780-71. We follow the Court's suggestion, and apply a mixed or blended approach, engaging in an analysis "meet for the case" — here, a thoroughgoing analysis that compels our confident conclusion that the principal tendency of defendants' agreement is anticompetitive and that the agreement thus violates § 1 of the Sherman Act. Accordingly, we reverse the district court and hold that defendants' profit sharing arrangement is unlawful.

B.

We first discuss the applicability of strict per se analysis. "The rationale of the rule of per se illegality depends on the premise[ ] that . . . judicial experience with a particular class of restraints shows that virtually all restraints in that class operate so as to reduce output or increase price." Areeda & Hovenkamp, ¶ 1911a, p.265. Accordingly, application of the per se rule is limited to restraints of a type that courts' "considerable experience" has revealed to have "manifestly anticompetitive effects," and no "redeeming virtue," such that judges can "predict with confidence that it would be invalidated in all or almost all instances under the rule of reason." *Leegin*, 551 U.S. at 886-87. Thus, the question for per se analysis is whether defendants' agreement is of a type that courts

have previously determined to have such pernicious effects. California argues that defendants' profit sharing arrangement was both a profit pooling agreement and a market allocation agreement, each of which courts have determined to be subject to per se invalidation. As we explain below, the contention that defendants' agreement was a market allocation agreement is without merit. The question whether it was a profit sharing agreement sufficiently similar to the profit sharing agreements that courts have previously examined and invalidated is much closer. Below, we discuss the relationship between defendants' profit sharing agreement and profit sharing agreements invalidated in prior cases, but ultimately do not determine whether defendants' agreement constituted a per se violation of the Sherman Act. Rather, as we explain in Section II.C *infra*, in determining that it was unlawful, we apply a per se-plus or a quick look-minus analysis, a combined or mixed approach, somewhere between pure per se and pure quick look, along the lines suggested by the Court in *California Dental Association*.

1.

California contends that defendants' profit sharing agreement is essentially identical to those profit pooling and sharing schemes that the Supreme Court has found to be per se violations of § 1. *See Citizens Publ'g Co. v. United States*, 394 U.S. 131, 134-35 (1969) ("Pooling of profits pursuant to an inflexible ratio at least reduces incentives to compete for circulation and advertising revenues and runs afoul of the Sherman Act."); *see also United States v. Paramount Pictures*, 334 U.S. 131, 149 (1948) (profit sharing agreement a "bald effort[ ] to substitute monopoly for competition"); *N. Sec. Co. v. United States*, 193 U.S. 197 (1904); *Chicago, M & St. P. Ry. Co. v. Wabash, St. L. & P. Ry. Co.*, 61 F. 993 (8th Cir. 1894); *Anderson v. Jett*, 12 S.W. 670 (Ky. 1889).

[4] Profit pooling or profit sharing arrangements eliminate incentives to compete for customers along every dimension:

there is little purpose in attempting to attract another firm's customers by lowering prices, improving quality or taking any other measure if the profits earned from those new customers would be placed in a common pool in which the other firm is a participant, and the proceeds distributed in the same way no matter which participant in the profit pool generated the underlying sales, or if transfer payments are made between firms to achieve the same effect. *See N. Sec. Co.*, 193 U.S. at 328 (pooling profits "destroys every motive for competition between . . . natural competitors. . . ."); *Chicago, M. & St. P. Ry. Co.*, 61 F. at 997 (a profit sharing agreement by which railroads that carried less than a predetermined share of freight were compensated by other railroads such that their share of total revenues remained constant had "[t]he necessary and inevitable result of . . . foster[ing] and creat[ing] poorer service and higher rates."). The Sherman Act was intended to curb just such restraints on competition.

Defendants contend that there are three ways in which their scheme differs from the profit pooling or sharing that was held unlawful in prior cases. The first of these contentions is meritless. Defendants argue that, unlike the agreements in prior cases, which provided that the parties would share all profits, their agreement provides that any party that experiences an increase in relative market share would share with the others only 15% of its increase in relative *revenue,* and that the sums to be redistributed are less than all of the profits earned on those increased revenues. There is no question, however, that the 15% figure was the defendants' estimate of the total additional profits to be earned as a result of any increase in relative market share while the profit sharing agreement was in effect. This intention to share all the additional profits earned is what is relevant. Richard Cox, a vice president of Safeway who helped to draft the agreement, stated in his deposition that the 15% was meant to represent accurately the profit that a chain would collect on increased revenues that were earned without an increase in fixed costs. Defendants do not dispute the accuracy of his testimony.

Their proffer is the statement of their expert witness, who conjectured that it was "plausible" and "likely" that incremental profits were greater than 15% of revenues, but admitted that he had done no analysis of incremental profitability based on data.[4] Defendants cannot force the expense of full rule-of-reason litigation on courts and opposing parties simply by speculating that they may have gotten their math wrong when they were setting up their scheme to share profits; their intent to share profits is sufficient, whether or not the scheme as implemented achieved that objective to perfection.

Defendants' other two contentions, however, persuade us that there is sufficient question as to whether we should invalidate their profit sharing scheme under a strict per se approach that we should refrain from doing so. Rather, we conclude that additional analysis of the agreement and its likely effects would be beneficial and that we should proceed to a quick look approach, or, more accurately, to a mixture or combination of the two approaches.

**[5]** First, while profit sharing agreements in previous cases were to last for decades or permanently, defendants' scheme is scheduled to last only for the period of the labor dispute, plus two additional weeks. *See Citizens Publ'g*, 394 U.S. at 133 (fifty year agreement); *Paramount Pictures*, 334 U.S. at 131 (considering apparently permanent profit sharing agreements); *N. Sec. Co.*, 193 U.S. at 197 (finding illegal an apparently permanent profit pooling arrangement); *Chicago, M. & St. P. Ry. Co.*, 61 F. at 996 ("[t]he contract was to continue for 25 years"). That the term of the scheme could expire in a relatively short period — anywhere from a week or two to a

---

[4]We note that the district court should not have accorded the expert's statement any weight given its explicitly speculative nature. "An expert's opinions that are without factual basis and are based on speculation or conjecture" are inadmissible at trial and are "inappropriate material for consideration on a motion for summary judgment." *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2nd Cir. 2008).

year or more, depending on the length of the strike — is no defense if the scheme is anticompetitive. Section 1 of the Sherman Act proscribes all anticompetitive agreements, regardless of their duration: neither the text of the statute nor the case law contains an exception for anticompetitive agreements that last for less than a fixed period of substantial length. However, defendants' contention is that no anticompetitive effects could result from their arrangement, because the potentially short term of the profit sharing leaves them with sufficient incentive to compete for customers, whose allegiance might be retained after the end of the strike. Because courts have not previously considered profit-sharing arrangements of a potentially short duration, we prefer not to simply apply a pure per se analysis to defendants' arrangement.

Second, unlike firms in most of the prior profit sharing cases, which were the only firms of their kind operating in the relevant market, defendants were not the only supermarkets in the affected areas. *See, e.g., Citizens Publ'g*, 394 U.S. at 133 (defendants the only general distribution newspapers in Tucson). As we conclude in Section IV.B below, California is correct that a profit sharing plan need not cover the entire market in order to affect competition. However, it is incorrect that the distinction between a profit sharing plan that covers the entire market and one that does not is unworthy of any consideration before we make a determination whether anticompetitive effects will result from an agreement. As with the previous distinction, courts have not explored the question sufficiently to allow us to feel entirely comfortable with applying a strict per se approach here.

2.

California also contends that the profit sharing agreement was a market allocation agreement that allocated the Southern California grocery market according to defendants' historic shares of that market. Market allocation agreements are "classic per se antitrust violation[s]." *See United States v. Brown*,

936 F.2d 1042, 1045 (9th Cir. 1991). Courts have treated as unlawful market allocations agreements assigning particular territories to particular vendors, *see Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50 (1990) (per curiam); *United States v. Topco Assoc., Inc.*, 405 U.S. 596 (1972), assigning certain customers to certain vendors, *see White Motor Co. v. United States.*, 372 U.S. 253 (1963), and capping total sales volume of the market and assigning participants fixed shares of that total volume, *see United States v. Andreas*, 216 F.3d 645, 666-68 (7th Cir. 2000). The common thread to these decisions is that in allocating the market, firms ensure that customers attempting to purchase products in the relevant market will have fewer firms competing for their business.

In contrast to the agreements at issue in the market allocation cases, however, defendants' agreement is not alleged to have decreased the number of firms available to customers. Rather, California alleged that the agreement simply reduced the competition for customers among the defendant firms. Thus, it does not allege a market allocation claim appropriate for either strict per se analysis or a mixed or blended approach, and we need proceed no further with that question in this opinion.

### 3.

**[6]** In view of the above, we decline to hold that California prevails on a strict per se theory.

### C.

**[7]** Turning from a strict per se to a quick look, or rather, in this case, to a combined or mixed approach, our analysis requires a thoroughgoing inquiry. An agreement is violative of § 1 of the Sherman Act under a quick look analysis when "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and mar-

kets." *Cal. Dental Ass'n*, 526 U.S. at 770. If so, the burden of proof shifts to the defendant "to show empirical evidence of procompetitive effects." *See id.* at 775 n.12; Areeda & Hovenkamp, ¶ 1914d1, p. 315-16. Accordingly, a court seeking to determine on a "quick look" whether an arrangement is violative of § 1 must first determine whether it can "easily . . . ascertain[ ]" a "great likelihood of anticompetitive effects," *see Cal. Dental Ass'n*, 526 U.S. at 770, and, if so, whether any such effects are neutralized or outweighed by procompetitive benefits.

Taking into account the Supreme Court's recent explanation that the "categories of analysis of anticompetitive effect are less fixed than terms like '*per se*,' 'quick look,' and 'rule of reason' tend to make them appear," and that rather than drawing "categorical line[s]" between restraints, a court reviewing an agreement that is alleged to violate § 1 must conduct "an enquiry meet for the case," *see id.* at 779-81, we look here to the history of judicial experience with profit sharing agreements, apply rudimentary economic principles to the meaning and effects of the particular agreement in question, and thoroughly analyze the circumstances, details and logic of the agreement in order to determine the likelihood of anticompetitive effects. After doing so, we consider the purported procompetitive effects that the defendants suggest are sufficient to overcome any anticompetitive effects of the agreement. The question, then, under the combined or mixed approach is whether, after conducting the review and analysis we have just described, we reach a "confident conclusion [that] the principal tendency" of the agreement is to restrict competition. *See id.* at 781.

We note that a "confident conclusion" does not always prove ultimately correct. *See supra* note 3. Rather, it represents a tool of judicial economy designed to save the litigants and the courts a considerable investment of time and money, which in the balance is to the benefit of all. That occasionally we might be wrong is a price that it is long established that

society is willing to pay. We might also note that some of the conclusions of which our leading economic experts have been confident have turned out to be incorrect. For example, Alan Greenspan, appointed and then reappointed Chairman of the Federal Reserve for five terms by four different Presidents, recently admitted to a significant flaw in the ideology that caused him to support and implement policies of financial deregulation: "I made a mistake in presuming that the self-interest of organizations, specifically banks and others, were such that they were best capable of protecting their own shareholders." *See* Paul M. Barrett, *While Regulators Slept*, N.Y. Times, Aug. 6, 2009, at BR 10. And Judge Richard Posner, a highly respected jurist and a leading economics expert, has recently expressed his admiration for Keynesian economics, reversing a lifetime of reliance on the Chicago School's approach. *See* John Cassidy, *Letter from Chicago*, The New Yorker, Jan. 11, 2010, at 28. Thus, a "confident conclusion" for purposes of quick look and other limited approaches means, at most, a reasonably confident conclusion that, on some occasions, may prove to be incorrect. Equally incorrect, however, may be a conclusion reached by economics experts after years of study or even a verdict reached by a jury following a full-scale trial with the most careful and thorough development of a full evidentiary record with the aid of the most experienced antitrust lawyers and expert witnesses.

Here, we are confident in our conclusion that defendants' profit sharing agreement creates "a great likelihood of anticompetitive effects," and that such effects are not outweighed or neutralized by any plausible procompetitive benefits. We are confident that neither the duration of the agreement nor the fact that the defendants have less than a 100% share of the market significantly affects the anticompetitive "principal tendency" of the profit sharing agreement. In reaching our conclusion, we have considered whether, because the objective of the agreement was to affect the outcome of a labor dispute and to bring about a reduction in labor costs, our conclusion should be altered. Our answer is a definite and unqualified

"No." Finally, although the parties introduced some evidence to support their respective positions, we do not rely on such empirical proof in reaching our conclusion; we note, however, that to the extent that it is relevant, the evidence appears either to support the conclusion that we reach, or, alternatively, to add little or nothing of any significance to our analysis.

1.

a.

Defendants entered into an agreement under which they shared profits with one another according to their historic shares of the market. As discussed above, the only factors distinguishing defendants' arrangement from a profit sharing agreement that would have constituted a per se violation of § 1 of the Sherman Act are the presence in Southern California of a number of supermarkets other than those operated by defendants, and the indefinite, if limited, term of the agreement. Absent these features, defendants' scheme would simply constitute a profit pooling or sharing arrangement akin to the ones held violative of § 1 in earlier cases, and there would be no question that the agreement creates a "great likelihood of anticompetitive effects." This is apparent from the fact that when firms sharing profits are the only firms in a market, each will receive the same portion of the total profits whether it cuts prices, invests in improving its products or services, or does nothing to win customers from the other firms; the result of this lack of competitive pressure is the high likelihood that prices rise towards monopoly levels or fail to fall with the same effect. It is for these reasons that the Supreme Court has said that "[p]ooling of profits pursuant to an inflexible ratio" is a "§ 1 violation[ ]" that is "plain beyond peradventure." *Citizens Publ'g*, 394 U.S. at 135-36.[5]

---

[5]This effect has been well understood for many years, and was ably explained well over a hundred years ago by the Kentucky Court of Appeal, then the highest court in that state, in the following discussion of a profit sharing arrangement between two steamboat companies:

The well-recognized effects of profit sharing that we have set forth above help to guide our discussion. We start from the premise that the sharing of profits between competitors ordinarily has substantial adverse effects on competition. We then consider whether either of the aspects of the agreement before us that defendants assert materially distinguish it from ordinary profit sharing arrangements would, in light of the "circumstances, logic and details of the restraint," preclude that agreement from having the anticompetitive effect that would otherwise occur.

In an ordinary period in which no profit sharing arrangement is in effect, defendants compete with one another and with a fragmented set of other grocers for customers and

---

There was a strong stimulation to increase the net profits by means other than that of popular favor springing out of efficient steamboat facilities and close attention to the business of shipping for reasonable charges and courteous attention to passengers at reasonable fare. . . . It is the competition, or fear of competition, that makes these carriers efficient, attentive, polite, and reasonable in charges. Remove competition, or the fear of it, and they become extortionate, inattentive, impolite, and negligent. . . . It is said that neither was bound to charge the same as the other. That is true; but either could extort with impunity, and the other would be an equal recipient of the fruit of the extortion. . . . It is true that their contract did not, in so many words, bind them to any given charges; but it made it to the interest of each, not only to charge, but to encourage and sustain the other in charges that would amount to confiscation. . . . This combination was more than that of a combination not to take freight or passengers at less than certain prices. In such case, the combiners have to furnish adequate means of transportation, and efficient and polite officers, and confine themselves as nearly as possible to the sum agreed upon, in order to secure the trade, or a reasonable portion of it; but here, by reason of the agreement . . . . [i]nefficient means of transportation, unskilled or inattentive officials, are no drawback to either boat. Its share of the profits come notwithstanding.

*Anderson v. Jett*, 12 S.W. 670, 671 (Ky. 1889).

sales, the primary competition being among the defendants. The fruits of successful competition might accrue both in the present, as a supermarket makes sales in the current period, and in the future, as customers won or retained through such competition return to the store to make more purchases. Defendants contend that a profit sharing agreement of limited duration, restricted to the dominant market participants, does nothing to alter the ordinary incentive structure, and that the competitive pressure while such a profit sharing agreement is in effect is no less than the competitive pressure that would occur in the absence of such an agreement. Having reviewed their contentions and analyzed all the plausible effects of the agreement, we are confident in our conclusion that defendants' profit sharing arrangement removes, or at the least significantly reduces, a key source of competitive pressure — competition among defendants for sales to be made during the agreement period — without there being any countervailing pressure sufficient to neutralize or overcome the overwhelming likelihood of anticompetitive effects. Although it is plausible that the two differences on which defendants rely will serve to reduce the competitive pressures to a lesser extent than would a long term agreement among competitors who control 100% of the market, it is evident that the lessening of the reduction in competitive pressure will be one of degree only, and that there is no likelihood whatsoever that the anticompetitive effects of a profit sharing agreement will be eliminated.

Preliminarily, as we have already stated, when an arrangement redistributes all profits on current sales among a group of competitors according to a predetermined ratio, as defendants' arrangement does, there is little reason for the individual firms within the group to compete with one another for those sales. Thus, we begin our analysis having determined that there is a high likelihood that defendants' agreement has a substantial negative effect on their incentives to compete with one another for customers in order to make sales during the period in which the agreement is in effect. Defendants

nonetheless contend that there is an incentive to compete with one another for customers during the profit sharing period, pointing to the indefinite duration of the agreement and to the possibility that customers who are won or retained through competition during that period will remain as customers after the agreement ends. Additionally, they contend that the other firms in the market will exert competitive pressure on them sufficient to make up for any loss of competitive pressure among themselves. We first consider these contentions for a period of limited duration in general, and then we consider whether the particular circumstance of the agreement — an impending labor strike — alters that general analysis.

[8] First, for a profit sharing agreement of limited but indefinite duration, the incentive to compete for sales and profits that would occur at some future time would be substantially less than the ordinary incentive to compete by seeking to attract customers who will patronize the stores starting immediately and will continue to patronize them in the future as well. Any decision to engage in competitive behavior in order to attract customers because they might buy goods at some future period in which profits would not be shared would be highly problematic at best. Defendants would face significant economic disincentives to the incurring of costs by advertising, discounting and engaging in similarly competitive behavior in order to compete for profits that would be realized, if at all, only at an indefinite point in the future. The sales that would produce those future profits might not be made for six months, or a year, or more. Intervening factors from the mobility of Southern California customers in general, to the willingness of short term customers to experiment with other vendors, to long term customers' attachment to long time vendors, to the occurrence of future sales and promotions, might well render the obtaining of any new customers of dubious value, and hardly worth the economic cost. By paying money now for sales that would occur, if at all, only in the indefinite future, the defendants would incur the ordinary costs of obtaining customers without receiving the ordi-

nary benefits that would accrue. Such conduct makes little economic sense. It is far more likely that, knowing that all of their chief competitors are in the same position, each of these once and future competitors would refrain during the profit sharing period from the expenses necessary to engage in such competition and count on their fellow defendants to do likewise. Thus, we cannot attribute significant weight to defendants' argument regarding the economic pressure to compete with each other for future customers during the profit sharing period, although it is possible that this factor could serve to reduce to some degree the loss of such pressure that might occur were the profit sharing agreement of longer duration. In short, viewing matters most favorably to the defendants, the anticompetitive effects resulting from an agreement of limited, if indefinite, duration might be diminished to some degree but would certainly not be eliminated.

With defendants exerting substantially reduced or no competitive pressure on one another during the profit sharing period, competition from firms not included in the profit sharing agreement would have to result in an extraordinary amount of increased competitive pressure to make up for the loss of the paramount pressure that the defendants ordinarily exert on each other. This too is highly unlikely. During the profit sharing period, defendants controlled at least 60% of the Los Angeles-Long Beach portion of the Southern California market and at least 70% of the San Diego portion, and between them operated more than 950 stores in the areas affected by the agreement, a combined presence sufficient to suggest an ability to significantly affect prices and other outcomes in the Southern California market.[6] Defendants would

---

[6]No precise standard exists for determining when a firm or a group of firms controls enough of a market that its actions might cause anticompetitive effects. However, the uncontested facts about defendants' share of the market and the fragmented nature of the rest of the market together appear to be sufficient to establish the monopoly power over the market required for a violation of § 2 of the Sherman Act, a higher standard than is

be at least partially insulated from competition from other vendors by virtue of the many and varied locations of their stores, which for numerous customers would be far more convenient to patronize than the markets operated by the other vendors. Defendants also would be partially insulated from such competition by the inability of the other vendors to compete effectively as a result of brand recognition (and, indeed, customer awareness of their existence), limited facilities, contracts with suppliers and staffing commensurate with their limited historical role in the market; factors that would substantially curtail the ability of the other vendors to serve additional customers.[7] Those other vendors would no more be able to increase their capacity, staff, supplies, and brand recogni-

---

required to find that a firm or firms had sufficient power in the market that their actions could violate § 1. *See Am. Tobacco Co. v. United States*, 328 U.S. 781, 797 (1946) (a firm over two-thirds of the market is a monopoly); *Syufy Enter. v. Am. Multicinema, Inc.*, 793 F.2d 990, 995 (9th Cir. 1986) (60-69% market share accompanied by a fragmentation of competition sufficient to show "monopoly power" over a market as required for violations of § 2 of the Sherman Act); *Pac. Coast Agr. Exp. Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1204 (9th Cir. 1975) (45-70% share of the market sufficient to show monopoly power where no other competitor had more than a 12% share of the market); *Eastman Kodak Co. v. Image Technical Serv., Inc.*, 504 U.S. 451, 481 (1992) ("Monopoly power under § 2 requires, of course, something greater than market power under § 1."); *cf.* United States Energy Information Administration, World Crude Oil Production, 1960-2008, http://www.eia.doe.gov/aer/txt/ptb1105.html (last visited January 28, 2009) (during the 1970s OPEC never controlled more than 56% of the world oil market).

[7]Another consideration is that a substantial number of alleged competitors product offerings differed substantially from those of defendants, including box stores selling goods in bulk, such as Costco, retailers selling a limited selection of products and brands, such as Trader Joe's, and stores specializing in organic foods, such as Whole Foods. These markets are by their nature incapable of competing for much of the business of traditional supermarkets such as those operated by defendants. Notwithstanding these obvious facts, Costco, Trader Joe's, and Whole Foods were each alleged by defendants to have placed competitive pressure on them during the labor dispute.

tion overnight than they could immediately open new locations convenient for defendants' customers. Nor would they be inclined to spend money to do so, knowing that the profit-sharing agreement was of limited duration, and, in fact, could end at any time. Finally, those other vendors are mainly independent of each other, consist of various types of markets, and would have neither the inclination nor the ability to agree on a uniform marketing policy that would significantly increase whatever competitive pressure the totality of those vendors ordinarily exerts on the defendants. The overwhelming likelihood appears to be that, on the whole, smaller vendors would do little if anything to alter their marketing practices but rather would continue on their ordinary course, which would not serve to increase their economic pressure on defendants beyond what they ordinarily exert, or attract any substantial portion of the customers that ordinarily patronize defendants.[8]

---

[8]Interestingly, economic theory suggests an even stronger negative effect on competition: it would appear to predict that, at least in the short run, in a market in which large, dominant firms have an agreement limiting competition amongst themselves, such an agreement will tend to increase the prices charged by those large firms, and that smaller firms, rather than increasing whatever economic pressure they ordinarily exert on those larger firms by charging the lower prices that would obtain under competitive conditions in order to attract the larger firms' customers, but will instead charge higher prices close to those being charged by the larger firms. *See* Herbert Hovenkamp, Federal Antitrust Policy § 4.1b (1994). Firms that pool profits are acting as a kind of cartel, and cartels that do not contain all the firms in the market are still able to raise prices above the prices that would be observed in a competitive marketplace, especially in a short term situation like that present here, in which the fixed costs of starting a supermarket (leases, employment and product purchasing contracts, signage, etc.) make it unlikely that new firms would enter the market to take advantage of the prices that are artificially high due to the cartel's collusive behavior. *See* Dennis W. Carlton & Jeffrey M. Perloff, Modern Industrial Organization 107-115, 122 (3d ed. 2000). Additionally, fixing market shares at precartel levels, as defendants essentially did here, is an "effective technique" for preventing cheating (in the form of competitive behavior) among members of the cartel. *See id.* at 139-40.

In sum, were a group of defendants with 60% or 70% of the market share to agree to enter into a profit sharing agreement for a 6, 12 or 18 month period for ordinary business reasons, there can be no doubt that neither the length of the period of the agreement nor the defendants' less than 100% market share would change the fact that the agreement, like profit sharing agreements in general, would be anticompetitive and would constitute a violation of § 1 of the Sherman Antitrust Act. Accordingly, there is little to support defendants' contentions that the term of the agreement or the presence of other vendors in the market would result in a different outcome regarding the nature of the agreement than would otherwise be dictated by prior well-established law.

We find it difficult to believe that any individual with a rudimentary knowledge of antitrust law would seriously contend that if the defendants agreed to share profits for a limited period for their mutual economic benefit, there would not be a violation of § 1 of the Sherman Act — at least in the absence of some extraordinary circumstance. Here, we consider whether the threat of a strike or the strike itself provides such a circumstance. First, we examine whether the profit sharing agreement loses its anticompetitive effects when it becomes operative during the course of a strike or labor dispute. We have no difficulty answering that question: the fact that the defendants' agreement provides for profits to be shared only during a labor dispute and a brief ensuing period does not alter its inherently anticompetitive nature. Even during a strike period, a profit sharing agreement generates a "great likelihood of anticompetitive effects." For a vendor, the principal features of an employee strike are diminished consumer demand, as some customers choose not to cross the picket lines; a reduced workforce, because some workers at least are on strike; and a more urgent financial condition, as fixed costs remain at nonstrike levels, and revenues go down. While diminished demand, a reduced workforce, and a more urgent financial condition might affect defendants' competitive behavior during the strike, these potential effects would

occur independent of the existence of a profit sharing agreement.[9] The profit sharing agreement itself would have an additional effect; it would cause defendants to compete even less during the strike period than they would were there no profit sharing agreement in effect at that time. Whatever the baseline circumstance as to competition in any given period, including a strike period, the existence of the profit sharing agreement results in a greater likelihood of less competition than there would otherwise be. That is the simple lesson that is apparent from a rudimentary knowledge of economics. Profit sharing necessarily serves to diminish the incentives to compete below whatever the level of competition would be in the absence of such an agreement; it is inherently, or as some courts have said, intuitively, *see Cal. Dental Ass'n*, 526 U.S. at 781, anticompetitive and has the same, or a similar, effect on competition during a strike as it would have before the strike and after it ends. The only real difference is that the level of competition that would be reduced by the agreement

---

[9]In terms of diminished consumer demand, the standard economic assumption is that as demand goes down, price goes down as well, either in absolute terms or by means of increased discounting. A diminished workforce might be expected to raise prices (or, at least, reduce discounting) by reducing the quantity of merchandise that defendants could sell, and, correspondingly, the overall supply of such goods in the market. Neither of these effects changes the basic impact of the agreement: defendants had little incentive to compete with one another while it was in effect, because any profits earned on sales to another defendant's former customers would simply be redistributed back to the other defendant. A more urgent financial condition would appear, if anything, to make it less likely that defendants would commit resources to competing with each other for customers from whom they would receive profits, if at all, only at some future date. To any extent that lower demand, lower supply, or strike-caused financial woes would prompt a defendant to try to win customers from vendors external to the agreement, the profit sharing agreement would, as in a nonstrike period, reduce its incentive for doing so: while the defendant would pay the entire cost (in advertising, improved quality, or discounting) of luring such customers, it would only retain a fraction of the benefit generated equal to its prestrike share of the market, and a substantial number of the new customers might well, for reasons discussed earlier, be lost by the time the labor dispute and profit sharing ended.

might be lower or higher depending on other circumstances, such as the existence of the anticipated labor dispute. A strike or some other unusual circumstance might result in the agreement having a lesser or greater anticompetitive effect than it would have ordinarily; however, whether greater or lesser, the net effect in all circumstances would be anticompetitive.

**[9]** For the reasons explained above, we conclude that "a great likelihood of anticompetitive effects can be easily ascertained" by examining the agreement in light of prior cases, in light of its circumstances and details, as well as in light of logic and rudimentary principles of economics. Here, those anticompetitive effects are not only substantial, but they result from an agreement that removes fundamental incentives to engage in competition for an indefinite period. In short, neither the fact that there are a number of smaller companies in the market, the fact that the agreement is of an indefinite though limited duration, nor the fact that the agreement takes effect during a strike, warrants a departure from the well-established rule that profit sharing agreements are anticompetitive and violate section 1 of the Sherman Act.

b.

Defendants' fall back position is that the state lacks empirical evidence to demonstrate that the effects of the agreement were anticompetitive in practice. However, neither per se nor quick look review ordinarily requires empirical evidence of anticompetitive effects, nor is it required for the combined or mixed per se/quick look approach that we apply here. As Professors Areeda and Hoverkamp explain, "[t]he main difference between . . . the 'quick look' approach and the rule of reason is that under the former the plaintiff's case does not ordinarily include proof of [market] power or anticompetitive effects." *See* Areeda & Hovenkamp, ¶ 1914d, at p. 315; *see also Cal. Dental Ass'n*, 526 U.S. at 779-81 (explaining that the "quality of the proof required should vary with the circumstances;" that "naked restraint[s] on price and output need

not be supported by a detailed market analysis in order to" move to the second step of the quick look analysis and "require" defendants to produce "some competitive justification"; and that not "every case attacking a less obviously anticompetitive restraint . . . is a candidate for plenary market examination") (citations, internal quotation marks omitted)). So long as the anticompetitive nature of the likely effects of an agreement is, as a theoretical matter, "obvious," it is not necessary for a plaintiff to provide empirical evidence demonstrating anticompetitive consequences. *See Cal. Dental Ass'n*, 526 U.S. at 770-71; *see also Nat'l Collegiate Athletic Ass'n v. Board of Regents of Univ. of Oklahoma*, 468 U.S. 85, 109-110 (1984). Such a rule is necessary in antitrust cases, where "reliable proof" of such effects might be "impossible to produce." *See* Areeda & Hovenkamp, ¶ 1901d, at pp. 188-89 (also noting that "in most [antitrust] cases . . . the impact on output," which in this case would be diminished sales at higher prices, "is assessed by inference from the nature of the agreement and surrounding circumstances, rather than empirical measurement").

This is a case in which reliable proof of anticompetitive effects or their absence through empirical evidence might be difficult to obtain. Defendants' own expert explained that because the profit sharing agreement took effect only during the labor dispute and both the agreement and the labor dispute might affect defendants' pricing decisions, the data required to best distinguish between the effects of the strike and those of the agreement and determine whether and how the agreement affected competition between the defendants does not exist. *See* Declaration of Thomas R. McCarthy at ¶ 47.

**[10]** This is, more important, a case in which the anticompetitive nature of the restraint is obvious. As discussed above, by the terms of the agreement any defendant that earns profits above its historic market share is required to give those additional profits to the other defendants. Because a defendant may not retain any profits that it made from competing with

the other defendants and receives a proportionate share of whatever profits those other defendants make from competing with it, the profit sharing agreement plainly reduces the competitive pressure among defendants for sales whenever it is in effect, during the strike or otherwise. To justify their conduct, defendants rely not on the neutral or positive effect on competition arising out of their agreement, but on other sources of competitive pressure — increased competition from other vendors and competition with one another for post-strike business. As explained above, it is wholly implausible that those factors would be sufficient to overcome the reduction in competitive pressure that necessarily results from the profit sharing agreement. Defendants' agreement plainly removes a significant source of competitive pressure without giving rise to any comparable counter-source to replace it.[10] Accordingly,

---

[10]The obviously anticompetitive nature of defendants' profit sharing agreement in a traditional market setting distinguishes it from the restraint in *California Dental Association*. Here, there is a long history of adjudging profit sharing agreements to be anticompetitive and of demonstrating the validity of that conclusion. The unique limits on price and quality advertising by dentists that were at issue in *California Dental Association* might have been thought by some to reduce incentives to compete over price or quality, because without such advertising it would be difficult for a dentist to inform potential customers about his advantages over his competitors, and thus, lowering his prices or expending resources to improve his quality might simply have reduced his profits from existing customers. However, the Court reasoned that the nature of the market for "professional services" such as dental care was unique and that the circumstances made it difficult to compare services across providers and to verify price and service information, meaning that price and quality advertising might have been misleading, and misleading advertising itself poses dangers to competition. *See Cal. Dental Ass'n*, 526 U.S. at 771-72. Accordingly, the Court concluded, that because of the "professional context," it was not implausible that, as a theoretical matter, the restriction on price advertising had either a positive effect or no effect on competition. *See id.* at 774-75. The Court emphasized that theoretical claims of anticompetitive effects that are not evident or established in antitrust law must be carefully considered and clearly explained in order to justify shifting the burden to defendants to show some procompetitive effect. *See id.* at 775 n.12. Here, the subjective factors that the Court found were critical to the sale of pro-

California has carried its burden by demonstrating the existence of a great likelihood of anticompetitive effects.

Although given the nature of the restraint at issue in the case, California was not required to adduce empirical evidence of anticompetitive effects, the empirical evidence before us supports its contentions or is, at the least, of no substantial consequence. Defendants acknowledge diminished competitive behavior such as discounting and advertising during the period in which the profit sharing agreement was in effect. This, in all likelihood, resulted in at least some increase in, or some failure to reduce, the prices charged to the consumers. *See* Declaration of Thomas R. McCarthy, Backup to ex. 7A; Declaration of Steven Lawler at ¶ 8; Declaration of Carla Simpson at ¶ 6-7; Declaration of Charles Ackerman at ¶ 15-19. They explain this change in behavior by attributing it to the lack of manpower created by the strike, rather than to the profit sharing agreement. However, their expert, who relied on this explanation, performed no regression or other statistical analyses, which are typical means of determining the effects of multiple variables, such as the labor dispute and the profit sharing agreement, on a single dependent variable, such as competitive behavior by defendants. *See, e.g.*, *Hemmings v. Tidyman's, Inc.*, 285 F.3d 1174, 1183-84 & n. 9 (9th Cir. 2002). Instead, he simply looked at limited data from Albertson's and declared that Alberton's "did a lot of discounting during the strike," and that it increased its use

---

fessional services do not exist. Economic theory as well as a practical analysis of the factual circumstances make it clear that there is a high likelihood that the profit sharing agreement had anticompetitive effects. Unlike *California Dental Association*, there is a clear theoretical basis for concluding that a profit sharing agreement would have anticompetitive effects, and, again unlike *California Dental Association*, there is no plausible basis, theoretical or otherwise, for concluding that the profit sharing agreement had procompetitive effects, *see* Section IV.2 *infra*. Accordingly, the burden to demonstrate evidence of the restraints procompetitive effects falls on defendants, who do not meet it in any way.

of certain discounting methods. *See* Declaration of Thomas R. McCarthy at ¶ 51-53. Because his analysis lacks a discussion of how much discounting Albertson's would have done absent the profit sharing agreement, it is beside the point. California's expert, who did perform regressions, asserted in his deposition that those regressions revealed that competition between defendants during the strike was harmed by the profit sharing agreement. He further noted that Vons raised its prices in the face of the strike and a dramatic drop in demand for its products, exactly the opposite of the lower prices that are expected when demand drops in a competitive marketplace.[11]

---

[11]Defendants' evidence purporting to show that employees charged with pricing during the dispute did not know about the profit sharing agreement and took no action because of it, which was relied upon by the district court, also fails to provide support for their contentions. Their evidence on this point is both skeletal and somewhat dubious. Defendants do not come close to demonstrating that all employees with power over pricing were ignorant of the agreement or took no action because of it. *See, e.g.,* Declaration of Bryan Davis at ¶ 3 (Albertson's employee describing himself as responsible only for the prices in a discreet category of groceries); Declaration of Carla Simpson at ¶ 2 (Safeway employee describing herself as having responsibility only for implementing pricing established by another department). Moreover, early in the strike the Los Angeles Times published a front page article revealing that the chains had agreed to share the financial burden of the strike. *See* Nancy Cleeland & Melinda Fulmer, *In Tactical Move, Union Pulls Pickets From Ralphs*, L.A. Times, Nov. 1, 2003, at A1. More important, it would defeat entirely the efficiency goals underlying the existence of per se, quick look, and "meet for the case" analysis if defendants could preclude a summary finding, and proceed to full rule of reason analysis, simply by asserting that the employees in charge of pricing did not know about the profit sharing. Such assertions are easy to make, while proving or disproving who knew what, and whether the knowledge of a particular individual had any effect on whether the company acted in a competitive manner, would require exactly the sort of onerous and costly production of evidence that summary review is meant to avoid. In any case, as noted above, the quick look inquiry is a probabilistic one: in order to place the burden on defendants to demonstrate that the agreement had a procompetitive effect, California need prove only that defendants' agreement to share profits created a great likelihood of anticompetitive effects. Accordingly, even if the anticompe-

Given the obviously anticompetitive nature of defendants' profit sharing agreement, no empirical data about the effects of the agreement is necessary for "an enquiry meet for [this] case." Nonetheless, we have reviewed the empirical evidence in the record for purposes of completeness. Doing so has only increased our certainty that defendants' agreement generated a great likelihood of anticompetitive effects, that it is implausible that such effects could be overcome or neutralized by the conduct of defendants or others during the term of the agreement, and that requiring a full rule of reason inquiry would be contrary to the efficient and effective implementation of our antitrust laws.

2.

Where, as here, a "great likelihood of anticompetitive effects can easily be ascertained," the burden of proof is shifted to the defendant "to show empirical evidence of procompetitive effects." *See Cal. Dental Ass'n*, 526 U.S. at 770, 775 n.12; Areeda & Hovenkamp, ¶ 1914d1, p. 315-16 (when "the restraint is of such a character that an anticompetitive effect may be presumed," then "the only tolerance permitted to the defendant is to show" procompetitive effects). Procompetitive effects include efficiency gains, the development or improvement of products, and other benefits to consumers and society. *See* Areeda & Hovenkamp, ¶ 1912c2, p. 289. In *California Dental Association*, for instance, the Supreme Court saw a plausible procompetitive justification for the dentist association's restrictions limiting price and quality advertising in the potential of such restrictions to improve consumer information by eliminating false and misleading advertising. *See Cal. Dental Ass'n*, 526 U.S. at 771-772.

---

titive effects had not come to pass because certain employees did not learn of the agreement or did not correctly calculate where the company's interests lay in light of the agreement, that fact would be immaterial to the result of our inquiry.

Here, we come to defendants' real defense. They assert that conduct that serves to reduce the cost of labor serves a procompetitive purpose, such as may excuse otherwise anticompetitive behavior. They contend that the procompetitive benefit of their agreement is that it increased their chances of winning the labor dispute and reducing the wages and benefits they would be required to pay to their employees, which in turn would increase their ability to lower prices and compete more effectively with other companies. *See* Declaration of Thomas R. McCarthy at ¶ 10.

As California points out, the chain of contingencies linking the profit sharing agreement to reduced prices for consumer purchases renders any such procompetitive benefits purely speculative. More important, driving down compensation to workers is not a benefit to consumers cognizable under our laws as a "procompetitive" benefit. "One of the important social advantages of competition mandated by the antitrust laws is that it rewards the most efficient producer and thus ensures the optimum use of our economic resources. This result, as Congress [has] recognized, is not achieved by creating a situation in which manufacturers compete on the basis of who pays the lowest wages." *United Mine Workers v. Pennington*, 381 U.S. 676, 725 (1965) (Goldberg, J., dissenting and concurring)*; see also* 15 U.S.C. § 17 ("The labor of a human being is not a commodity or an article of commerce"). Depressing wages is not of societal benefit; it simply harms working people and their families, a significant part of the group that has come to be known as "the middle class."

In any event, the defendants' argument is wholly unpersuasive in light of our nation's labor laws and policies. It is a primary objective of our nation's laws to protect the rights and interests of working persons, and to enable them to obtain a fair and decent wage through collective action. Reducing workers' wages and benefits is hardly an objective that would justify a violation of our antitrust laws or a benefit so substantial to the public as to overcome the deleterious consequences

of anticompetitive conduct. We see no reason, even if we had the authority to do so, to set aside the ordinary principles governing antitrust law in order to unbalance the carefully developed legal structures relating to our laws governing collective bargaining; nor do we see any reason or justification for assuming the function of increasing the economic power of employers to the disadvantage of their employees. To the extent that anticompetitive conduct is exempted from the application of our antitrust laws in order to facilitate the operation of labor/management processes, that is reflected in the implied labor exemption that we discuss in Section III *infra*.

Accordingly, we conclude that defendants have not offered, much less demonstrated, any way in which their agreement generated procompetitive effects.

3.

**[11]** Defendants have put forward no plausible procompetitive effects to overcome or neutralize the great likelihood of anticompetitive effects that would result from the implementation of their profit sharing agreement. That likelihood is evident from a plain reading of the agreement's terms, an examination of the ample case law regarding profit sharing agreements, a rudimentary knowledge of economics, and our analysis of the "circumstances, details, and logic" of the agreement. In the absence of a procompetitive justification that outweighs the likelihood of substantial anticompetitive effects, we conclude with confidence and certainty that the profit sharing agreement violates § 1 of the Sherman Act, and that requiring California to engage in a full rule of reason review would be contrary to the fundamental policies underlying our antitrust laws.

III.

Having determined that defendants' agreement violates section 1 of the Sherman Act because of the great likelihood that

its implementation would result in anticompetitive effects, we must next consider defendants' principal contention — that because their agreement was entered into in anticipation of a labor dispute, and constitutes part of their method of dealing with such a dispute, it is excused from the application of the antitrust laws by virtue of the nonstatutory labor exemption. As we have previously noted, this contention lies at the heart of defendants' defense of their obviously anticompetitive agreement; if that agreement is to be excused, it must be because of its role in the labor dispute.

Congress encourages collective bargaining and the formation of labor unions as part of our national labor policy. *See, e.g.*, *Phoenix Elec. Co. v. Nat'l Elec. Contractors Ass'n*, 81 F.3d 858, 860 (9th Cir. 1996). These processes involve and result in conduct that conflicts, at some level, with our antitrust laws, which bar restraints on competition. *See* Areeda & Hovenkamp, ¶ 255a, p. 167 (explaining that labor unions can be construed as combinations in restraint of trade). The history of Congress's efforts to reconcile these two basic national policies, and its struggle with the federal courts in doing so, plays an essential part in our analysis here.

In the early days of the Sherman Act, courts applied its prohibitions to labor union activity, most frequently by enjoining such conduct. *See United States v. Hutcheson et al.*, 312 U.S. 219, 229-30 (1941); *see also Loewe v. Lawlor*, 208 U.S. 274 (1908). Congress attempted to limit such judicial applications of the Sherman Act through the Clayton Act, which "was designed to equalize before the law the position of working-men and employer as industrial combatants." *See Hutcheson*, 312 U.S. at 229 (quoting *Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 484 (1921) (Brandeis, J., dissenting)). In section 20 of the Clayton Act, Congress barred courts from issuing injunctions against a set of enumerated labor union practices and from treating those practices as illegal. *See* 29 U.S.C. § 52. However, in *Duplex Printing Press Co. v. Deering*, 254 U.S. 443 (1921), the Supreme Court again limited

Congress's actions, this time by restricting the reach of section 20 to activities directed against an employer by its own employees, thus reading into the Clayton Act "the very beliefs which that Act was designed to remove," *see Hutcheson*, 312 U.S. at 230, and, in essence, "swe[eping] away" section 20, *see Pennington*, 381 U.S. at 702-03. Having failed to succeed in its first few efforts, Congress responded even more directly to the actions of what it perceived to be an anti-labor, anti-union federal judiciary with the Norris-LaGuardia Act. *See* 29 U.S.C. § 101 *et seq*. The aim of that Act was "to restore the broad purpose which Congress thought it had formulated in the Clayton Act but which was frustrated . . . by unduly restrictive judicial construction." *See Hutcheson*, 312 U.S. at 235-36. Together, the Clayton and Norris-LaGuardia Acts finally managed to overcome the resistance of the federal courts and exempted trade union activities from review under the Sherman Act. *See id.* at 236.

[12] The Acts, nevertheless, explicitly immunized only arrangements and agreements among employees, and did not extend protection to those involving both unions and employers. *See Pennington*, 381 U.S. at 662. The courts, having become more sympathetic to collective bargaining, then stepped into the breach, and implied a nonstatutory labor exemption to shield from antitrust review basic arrangements involving labor and management. The logic behind the exemption is simple: "it would be difficult, if not impossible, to require groups of employers and employees to bargain together, but at the same time to forbid them to make among themselves and with each other *any* of the competition-restricting agreements potentially necessary to make the process work or its results mutually acceptable."[12] *See Brown v.*

---

[12]The use of the term "any" by Justice Breyer demonstrates how difficult it is to write sentences that do not contain ambiguities. Clearly, the former professor meant the sentence to state that the law could not logically forbid all competition-restricting agreements rather than that it could not logically forbid any one such agreement, no matter how injurious the antitrust violation and how questionable the labor law interest. Fortunately, in *Brown* the message is clear from the sentences surrounding the one in question.

*Pro Football, Inc.*, 518 U.S. 231, 237 (1996) (emphasis in original). Accommodating "the congressional policy favoring collective bargaining" and "the congressional policy favoring free competition in business markets requires that some union-employer agreements be accorded a limited non-statutory exemption from antitrust sanctions." *Connell Constr. Co., Inc. v. Plumbers Local 100*, 421 U.S. 616, 622 (1975). The Supreme Court most recently discussed the nonstatutory labor exemption in *Brown v. Pro Football, Inc.*, in which it held for the first time that an agreement among a group of employers might, under narrow circumstances, be entitled to an exemption from the antitrust laws. In that case, the Court held that the National Football League's unilateral imposition of certain terms and conditions, after reaching an impasse in bargaining with the Players Association, constituted a well-recognized procedure in the collective bargaining process and was therefore exempt from antitrust review. *See Brown*, 518 U.S. at 234-35.

### A.

Not every restraint on competition that employers and employees might impose through the collective bargaining process is immune from antitrust review. *See Pennington*, 381 U.S. at 665-666 (holding that the nonstatutory labor exemption does not immunize agreement between unions and large coal producers to impose higher wages on small producers with the intent to drive those producers out of the market and thus limit output and raise prices); *id.* at 663 (no exemption would be appropriate "[i]f the [union] in this case, in order to protect its wage scale by maintaining employer income, had presented a set of prices at which the mine operators would be required to sell their coal"); *Local Union No. 189, Amalgamated Meat Cutters v. Jewel Tea Co., Inc.*, 381 U.S. 676, 693 (1965) ("an effort by the unions to protect one group of employers from competition by another . . . is conduct that is not exempt from the Sherman Act"); *cf. Connell Constr.*, 421 U.S. at 622-23 (refusing to immunize under the labor exemp-

tion a union attempt to organize mechanical subcontractors in the construction industry by forcing the general contractors who were consumers of the subcontractors' services to purchase services only from union subcontractors, thus "exclud[-ing] those nonunion subcontractors from a portion of the market, even if their competitive advantages were not derived from substandard wages and working conditions but rather from more efficient operating methods").

In *Brown*, the Court explained that the "implicit [(nonstatutory labor)] antitrust exemption . . . applies where needed to make the collective bargaining process work." *Brown*, 518 U.S. at 234. Although it "left the precise contours of the exemption undefined," *Clarett v. Nat'l Football League*, 369 F.3d 124, 138 (2d Cir. 2004) (per Sotomayor, Circuit Judge), the balance of the Court's opinion nevertheless provides guidance as to the meaning of this standard, at least as far as multiemployer agreements are concerned. The Court stated that multiemployer bargaining groups need to be able to impose terms in the face of an impasse unilaterally. *See id.* at 239-242. It reasoned that without an exemption for such actions, employers involved in multiemployer bargaining would be in a no-win position in the event of an impasse, with individual employer members facing possible charges for labor law violations (unfair labor practices) if they imposed terms that diverged significantly from the multiemployer group's last joint offer, and possible antitrust law violations (based on similarity of action and a history of conversations between the parties) if they individually imposed terms similar to that last offer. *See id.* at 241-42; *see also id.* at 244-45. Collective bargaining, the Court added, cannot be said to be working in circumstances in which employers are exposed to liability for simply participating in multiemployer bargaining and employing historic and well-established bargaining tactics. *See Brown*, 518 U.S. at 240. Multiemployer bargaining, the Court noted, is an important variant of collective bargaining that has long played a significant and positive role in our national

labor policy. *See id.*; *see also NLRB v. Truck Drivers Local Union No. 449* (*Buffalo Linen*), 353 U.S. 87, 94-96 (1957).

In determining that it was appropriate to apply the exemption to the NFL clubs' group action, the Court singled out two aspects of that joint conduct. First, it explained that "[l]abor law itself regulates directly, and considerably, the kind of behavior here at issue — the post-impasse imposition of a proposed employment term concerning a mandatory subject of bargaining." *Brown*, 518 U.S. at 238. It noted that the National Labor Relations Board and the courts have developed a set of "carefully circumscribed conditions" limiting the nature of the terms that can be imposed by employers post-impasse and restricting the imposition of such terms to instances in which the collective bargaining proceedings leading up to the impasse were "free of any unfair labor practice." *See id.* at 238-39. These carefully developed restrictions, the Court emphasized, "reflect the fact that impasse and an accompanying implementation of proposals constitute an integral part of the bargaining process." *See id.* at 239.

Second, the Court explained that "[m]ultiemployer bargaining itself is a well-established, important, pervasive method of collective-bargaining" and that the conduct at issue in the case —"the joint implementation of proposed terms after impasse[ — ]is a familiar practice in the context of multiemployer bargaining." *See id.* at 239-40.

[13] "The upshot" of the Court's discussion, as it put it, was that in multiemployer bargaining, as in all other bargaining, the post-impasse imposition of a proposed employment term concerning a mandatory subject of collective bargaining is exempt under the nonstatutory labor exemption, because such conduct "plays a significant role in a collective-bargaining process that itself constitutes an important part of the Nation's industrial relations system." *Id.* at 240. Where the conduct at issue plays such a traditional role in collective bargaining, an exemption from the antitrust laws is appropri-

ate. An exemption, the Court said, avoids "requir[ing] anti-trust courts to answer a host of important" labor law questions, such as "practical questions about how collective bargaining over wages, hours, and working conditions," mandatory subjects for such bargaining, "is to proceed." *See id.* at 240-41. Hence, in *Brown*, the exemption was "needed to make the collective bargaining process work," *id.* at 234, because "to permit antitrust liability [would have] threaten[ed] to introduce instability and uncertainty into the collective-bargaining process," with respect to core labor-management issues to which the NLRB, and the courts reviewing such issues, have habitually applied well-established principles of labor law, *see id.* at 242.

In contrast, defendants' profit sharing conduct has not traditionally been regulated under labor law principles, nor does it raise issues either on its face or in its practical implementation that are suitable for resolution as a matter of labor law, by the NLRB, or by the courts that review or implement Board rulings. There is no well-defined set of NLRB rules or principles that would govern the circumstances in which such conduct would be permissible, and the conduct does not involve any mandatory subject of collective bargaining. Perhaps most important, profit sharing is not "needed to make the collective bargaining process work." To the contrary, collective bargaining has worked and does work quite well from the standpoint of employers without the need to engage in such basic violations of the antitrust system.

Profit sharing implicates the core concerns of the antitrust laws, and such concerns are best resolved by courts steeped in antitrust law and its principles. Such is the historic means by which profit sharing, market allocation and price fixing agreements have been adjudicated. The only relationship of profit sharing agreements to labor matters is the possibility that they would unbalance the existing, carefully drawn process, and strengthen the hand of employers in labor disputes by means that would otherwise violate well-established anti-

trust policies — means that have not been historically authorized for use as part of the collective bargaining process.

It is the labor law practices essential to collective bargaining that the nonstatutory exemption is designed to protect. Profit sharing is not such a practice. Unlike post-impasse imposition of terms or conditions of employment, profit sharing is not a subject that has been regulated or adjudicated by the NLRB or by courts applying labor law principles. Labor law's focus is on "protecting the exercise by workers of full freedom of association [and] self-organization" and promoting industrial harmony by "encouraging the practice and procedure of collective bargaining" and "prevent[ing] any person from engaging in any unfair labor practice . . . ." *See* 29 U.S.C. §§ 151 & 160; *see also* 29 U.S.C. § 159 (unfair labor practices include, *inter alia*, interfering with employees' rights to organize and bargain collectively).

Labor law is utterly unconcerned by, and contains no provisions for dealing with, the preservation of the benefits of a competitive marketplace for consumers, or protecting consumers from competition-restraining arrangements such as defendants' profit sharing agreement. That is the job of the antitrust enforcers. As the Court has explained, "Congress has not authorized the NLRB to police, modify, or invalidate collective-bargaining contracts aimed at regulating competition or to insulate bargaining agreements from antitrust attack." *See Fed. Mar. Com'n v. Pac. Mar. Ass'n*, 435 U.S. 40, 61 (1978).

That defendants' profit sharing agreement lies completely outside the matters regulated by labor law is crucial to the question whether the antitrust exemption should apply for at least two reasons. First, if immunized by the exemption, defendants' conduct, which restrains competition and harms consumers in violation of our antitrust regime, would go completely unregulated: it would not be subject to review by any authority familiar or concerned with the principles of antitrust

law, and would not present any traditional issues of labor law that the NLRB was "authorized to police." *Id.* This is in stark contrast to *Brown*, in which defendants' conduct presented a traditional labor law issue that was "carefully circumscribed" by fundamental principles established by the NLRB and regulated by the Board as a matter of labor law. *See Brown*, 518 U.S. at 238. Second, and again in contrast to *Brown*, the determination that defendants' agreement is unlawful does not "require [this] court[ ] to answer a host of important practical questions about how collective bargaining over wages, hours, and working conditions is to proceed." *See id.* at 240-41. Rather it requires only that we consider traditional issues of economics and antitrust law, such as the anticompetitive effects of a profit-sharing agreement when the term of the agreement is of a limited duration and the parties' control of the market is less than 100%. *See* Section II.

To conclude that defendants' profit sharing agreement violates § 1 of the Sherman Act does not require us to answer *any* fundamental labor law questions that are traditionally within the purview of the NLRB. The unlawfulness of defendants' profit sharing agreement has nothing whatsoever to do with the procedures for collective bargaining, and nothing, moreover, to do with the mandatory subjects of collective bargaining negotiations, such as wages, hours and working conditions. *See id.* at 250 (noting as a basis for its decision that the *Brown* defendants' conduct concerned mandatory subjects of negotiation). Instead, our decision has everything to do with the anticompetitive effect of particular conduct on customers and markets.

In terms of whether defendants' conduct is a familiar and well-established practice in multiemployer bargaining, no extended discussion is necessary. The implementation of proposed terms after an impasse is, as the Court explained, "an integral part of the collective bargaining process," and it "plays a significant role" in the multiemployer bargaining process, propositions for which the Court cites decades' worth

of cases. *See id.* at 239-40. Profit sharing by employers has no history in connection with multiemployer bargaining and has proved necessary neither to the development of that process nor to the collective bargaining process in general. Because such profit sharing is not, and has not been, a necessary part of collective bargaining, there is no danger that "permit[ting] antitrust liability" in this case would "threaten[ ] to introduce instability and uncertainty into the collective-bargaining process." *See id.* at 242. Rather, the process would continue unchanged.

[14] Defendants' profit sharing arrangement lies outside the basic concerns of labor law, and such arrangements have never played a role in the collective bargaining process. Such agreements, which damage competition between firms that sell products and services to consumers, are the core concern of the antitrust laws. *See Allen Bradley Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers*, 325 U.S. 797, 809 (1945) ("The primary objective of all the Anti-trust legislation has been to preserve business competition . . . ."). This in itself gives strong reason to conclude that the nonstatutory exemption does not apply in the instant case.[13]

[15] A related consideration that militates strongly against affording the profit sharing agreement protection under the nonstatutory exemption is that it constitutes a direct restraint on competition between firms in the market to sell goods and

---

[13]The fact that the nonstatutory labor exemption is a court-created doctrine that operates to limit the application of antitrust statutes created by Congress requires such a consideration. The nonstatutory exemption's authority derives wholly by implication from Congress's enactment of the statutory exemption. It thus reaches no further than is necessary to accommodate the intent underlying that enactment, and must be reconciled with Congress's other explicit enactments. *See Allen Bradley Co.*, 325 U.S. at 809-810 ("It would be a surprising thing if Congress, in order to prevent a misapplication of [antitrust] legislation to [collective bargaining], had bestowed upon [parties to collective bargaining] complete and unreviewable authority . . . to frustrate its primary objective.").

services to consumers (the "product market"). The Court has consistently affirmed that the nonstatutory exemption has no application to agreements in which the "the restraint on the product market is direct and immediate." *See Pennington,* 381 U.S. at 663-664; *Connell Constr.*, 421 U.S. at 622-23; *see also Brown v. Pro Football, Inc.*, 50 F.3d 1041, 1051 (D.C. Cir. 1995) *aff'd*, *Brown*, 518 U.S. at 250; *Am. Steel Erectors, Inc. v. Local Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers*, 536 F.3d 68, 79 (1st Cir. 2008); *Mid-America Reg'l Bargaining Ass'n v. Will County Carpenters Dist. Council*, 675 F.2d 881, 893 (7th Cir. 1982); Areeda & Hovenkamp, ¶ 257a, p. 225. In *Brown*, there was no contention, nor could there have been, that consumers would be hurt by the imposition of particular salary and other working conditions on the members of the NFL development squads, nor by any determination regarding the composition of such squads. Here, the agreement creates a great likelihood of direct harm to the public through reduced competition between defendants for sales during the course of the strike. In view of the type of consequences that flow from the implementation of the agreement at issue here, as well as the other factors we discuss above, we conclude that the implied nonstatutory exemption is not applicable in this case.

Defendants' claims as to the necessity for their agreement as a matter of collective bargaining do nothing to change that conclusion. Essentially, defendants seek an exemption in order to permit them to engage in unlawful conduct in order to help them defeat their employees' collective bargaining representatives who are engaging in perfectly lawful conduct. Defendants claim no purpose for their agreement beyond strengthening their hands in a labor dispute, so as to allow them to reduce the economic impact of a strike, a lawful tool of collective bargaining, and ultimately to be able to limit the wages and benefits of their employees. They do not assert that they could not reach an agreement with the unions without violating the antitrust laws — in fact, the history of multiemployer collective bargaining is to the contrary. Defendants

assert only that the agreement would help them protect themselves against whipsaw tactics by the unions, legitimate tactics in which unions are permitted to engage under our labor laws. [*See* Gray Brief at 6-8.] Beyond the fact that the profit sharing agreement was written to take effect whether or not the unions used such tactics, defendants had several options for countering such tactics, none of which is contrary to the antitrust laws: for example, collectively locking out workers and replacing them with nonunion workers, *see Buffalo Linen*, 353 U.S. at 96-97; *see also* 29 U.S.C. §§ 158(d), 173(c), 176 & 178 (specifically contemplating lockouts as an expected and integral part of the collective bargaining system), and purchasing strike insurance, *see W.P. Kennedy v. Long Island R. R. Co.*, 319 F.2d 366 (2nd Cir. 1963).[14] These responses have sufficed for decades to ensure that multiemployer collective bargaining works efficiently without the need to engage in violations of the antitrust laws that would harm competition and consumers in the very way that those laws are designed to prevent. The profit sharing agreement for which the defendants now seek a nonstatutory exemption, accordingly, is clearly not an agreement that is "needed" for the operation of the collective bargaining process. *Brown*, 518 U.S. at 234.

To the extent that defendants argue that other responses would leave them open to economic pressure from the unions, the answer is obvious: the collective bargaining process contemplates that the respective parties will incur economic pressures and that those pressures will lead to a resolution of the dispute. Labor unions face the severe economic pressure that

---

[14]The difference between the strike insurance in *Kennedy* and defendants' profit sharing agreement is that the firms using strike insurance in *Kennedy* paid a fixed amount (as opposed to an amount that varied with revenues) for protection and that protection covered only fixed costs, such as property taxes, pension payments and interest charges on debt. *See W.P. Kennedy*, 319 F.2d at 369. Unlike defendants under their profit sharing scheme, individual firms purchasing such insurance would retain any increase in profits earned during the labor dispute and suffer fully any reduction.

a lockout of its members causes. Employers face the economic pressures that a loss of profits may produce. *See, e.g.*, *NLRB v. Ins. Agents' Int'l Union*, 361 U.S. 477, 489 (1960) (noting "the legitimacy of the use of economic weapons, frequently having the most serious effect upon individual workers and productive enterprises, to induce one party to come to the terms desired by the other"). The purpose of the nonstatutory exemption is not to suspend the consumer protections afforded by the antitrust laws in order to shift the balance in economic pressures that the parties may bring to bear in the course of labor disputes. That balance results from the now well-established functioning of the bargaining process — a process the operation of which has been authorized by Congress after balancing the rights of employers and their employees, and adopting a system it deemed fair to both sides. A surfeit of concern for *employer* strength in labor disputes would be contrary to Congress's intent to ensure that *employees* have sufficient strength to negotiate with their employers. *See* 29 U.S.C. § 102 (titled "Public policy in labor matters declared"); *see also Pennington*, 381 U.S. at 704 n.4 ("The purpose of the [Norris-LaGuardia Act] is to protect the rights of labor . . . .") (quoting H. R. Rep. No. 72-669, at 3 (1932)); *Hutcheson*, 312 U.S. at 235 (same). Nothing in *Brown* casts doubt on this longstanding policy: the Court in *Brown* afforded protection to the employer agreement not to increase the bargaining power of employers, but to permit the operation of the customary practices attendant to multiemployer collective bargaining, with the beneficial effects that its existence has on the parties and the general public. *See Brown*, 518 U.S. at 241.

## B.

For their part, defendants read *Brown* as a watershed event, arguing that it created a rule under which any employer conduct that occurs in the context of a collective bargaining dispute is insulated from antitrust review by the nonstatutory labor exemption. They also argue that as part of this general

expansion of the exemption, *Brown* abandoned the distinction between agreements that operate only in the labor market, which have been treated historically as exempt, and those that also affect competition in the product market, which are generally subject to the antitrust laws.

Defendants misread *Brown* and massively overstate its change to the nonstatutory labor exemption doctrine. It is true that *Brown* was the first case to apply the exemption to an agreement between employers alone, as opposed to an agreement between employers and employees.[15] *See Brown*, 518 U.S. at 238; *see also* Areeda & Hovenkamp, ¶ 257b2, p. 233. However, the Court understood and explained this application of the exemption as continuous and consistent with the "rationale" of the exemption as employed in previous cases, *see* Brown, 518 U.S. at 243; *see also Brown*, 50 F.3d at 1050, and it built its nonstatutory exemption analysis entirely on the foundation of those cases, *see Brown*, 518 U.S. at 235-37.

Additionally, at no point did *Brown* indicate any intention to erase "the line between the product market and the labor market," which "the Court has consistently sought to draw" when applying the nonstatutory exemption. *See Brown*, 50

---

[15]By applying the exemption to an employer only agreement, the Court appears to have abrogated the *Mackey* test, which was previously the rule in this Circuit for determining when the nonstatutory exemption applied. *See Phoenix Elec, Co. v. Nat'l Elec. Contractors Ass'n*, 81 F.3d 858, 861 (9th Cir. 1996); *Cont'l Mar. of San Francisco, Inc. v. Pac. Coast Metal Trades Dist. Council*, 817 F. 2d 1391 (9th Cir. 1987). The *Mackey* test allowed for application of the nonstatutory labor exemption only where (1) "the restraint on trade primarily affects only the parties to the collective bargaining relationship"; (2) "the agreement sought to be exempted concerns a mandatory subject of collective bargaining"; and (3) "the agreement sought to be exempted is the product of bona fide arm's-length bargaining" between the unions and employers. *Mackey v. Nat'l Football League*, 543 F.2d 606, 614 (8th Cir. 1976). While the first two conditions obtained in *Brown*, the third did not, because an employer-only agreement is manifestly not the product of arm's length bargaining between unions and employers.

F.3d at 1051 (citations omitted); *see also* Section III.A *supra.* Nor would there have been any reason for the Court to do so. *Brown* presented only the narrow question whether the nonstatutory exemption applied "to an agreement among several employers bargaining together to implement after impasse the terms of their last best good-faith wage offer," *Brown*, 518 U.S. at 238, conduct that, the Court emphasized, "grew out of, and was directly related to, the lawful operation of the bargaining process"; "involved a matter that the parties were required to negotiate collectively"; and "concerned only the parties to the collective-bargaining relationship," *see id.* at 250. Put another way, the agreement at issue in *Brown* had a direct effect only on the market for labor, and affected only the parties involved in a collective bargaining relationship regulated by the labor laws. *Brown* in no way suggests that the nonstatutory labor exemption applies where the conduct in question has a direct effect on the product market, or on the consumer himself.

To read *Brown*, as defendants suggest, as extending the labor exemption to agreements with a direct effect on the market for products and services would be highly injurious to consumers. In addition to profit sharing, employers could use other anticompetitive agreements, such as price fixing and output restrictions, in order to align their economic interests so as to aid them in defeating unions in the collective bargaining process. The consequences for consumers might last indefinitely: the collective bargaining process and disputes arising from it can last for months or even years. Defendants' reading of *Brown* is not supported by anything in the case itself, nor by precedent, nor by policy considerations.

## C.

**[16]** Defendants ask us to apply the nonstatutory labor exemption to immunize their profit sharing agreement from the antitrust laws. The agreement, however, is not "needed to make the collective-bargaining process work," *Brown*, 518

U.S. at 234, nor does it raise questions that are ordinarily resolved by, or even susceptible to resolution by, the application of labor law principles. Finally, the agreement has a direct adverse effect on the consumer and the product market. Under these circumstances, to exempt defendants' anticompetitive agreement from the antitrust laws simply because it was entered into in order to help employers prevail in a labor dispute would be contrary to the fundamental principles of both labor and antitrust law, as well as to the actions of both Congress and the courts in their efforts to reconcile those two important bodies of national law. Accordingly, we hold that the nonstatutory labor exemption does not apply to defendants' profit sharing agreement.

## IV.

**[17]** We AFFIRM the district court's denial of summary judgment to defendants, and hold that the profit sharing agreement (which defendants term a "revenue sharing provision") of the Mutual Strike Assistance Agreement is not immunized from antitrust review by the nonstatutory labor exemption. For the reasons set forth herein, we also REVERSE the district court's denial of summary judgment to plaintiff, and hold that defendants' profit sharing agreement violates § 1 of the Sherman Act. We remand to the district court for entry of judgment in favor of the plaintiff and for any further proceedings as may be consistent with this opinion.

AFFIRMED in part, REVERSED in part, and REMANDED.

---

WARDLAW, Circuit Judge, concurring in part and dissenting in part:

I agree with the conclusions of the district court and majority that the Mutual Strike Assistance Agreement ("MSAA")

lies outside the nonstatutory labor exemption, and agree with the district court's conclusion that the MSAA, the arrangement in question, is not a per se violation of section 1 of the Sherman Act. I would also affirm the district court's denial of the State of California's summary judgment motion because California failed to provide sufficient evidence of the arrangement's anticompetitive effects as a whole and in context to meet its burden on summary judgment. As for the pro-competitive effects or the possibility that there is no impact on the market as a result of the novel arrangement at issue, there exist genuine issues of material fact that preclude summary judgment.

The majority relies on *California Dental Ass'n v. Federal Trade Comm'n*, 526 U.S. 756 (1999), to devise a new standard of "per se-plus or quick look-minus" antitrust review that it believes is required to review the arrangement here. As it must: as the State of California itself points out, no case has ever held that revenue-sharing associated with a multi-employer labor negotiation operates as a restraint of trade in violation of the Sherman Act. If the MSAA were a pure profit-sharing arrangement across the entire market, there would be no need for a new standard, because the per se rule would apply. *Cf. Citizen Publishing Co. v. United States*, 394 U.S. 131, 135 (1969) ("Pooling of profits pursuant to an inflexible ratio . . . runs afoul of the Sherman Act.").

Here, seven local unions affiliated with the United Food and Commercial Workers ("UFCW"), of which six operated as a multi-union bargaining unit, agreed that grocery chains Ralph's, Vons, and Albertson's[1] could operate as a multi-employer bargaining unit for renegotiation of the collective bargaining agreement set to expire shortly. By entering into the MSAA, the grocery chains sought to deter the unions from bringing economic pressure to bear on one single employer

---

[1]The fourth party to the MSAA, Food4Less, a subsidiary of Ralph's, had a separate contract with UFCW, expiring four months later.

with the intent of forcing that employer to exert pressure on the others to settle on unfavorable terms. The MSAA thus established an understanding that "a strike against one Employer will amount to a strike against all Employers." The arrangement set forth certain mutual obligations, including that if one employer was struck, each other signatory would lock out all union employees within forty-eight hours, and that a revenue-sharing provision would be triggered in the event of a strike. Under the revenue-sharing provision, the grocery chains agreed to reimburse those that lost revenue due to a strike in an amount that would maintain their relative revenues pre- and post-strike. It is undisputed that during the labor negotiations other competition existed in the relevant market, and that the MSAA would expire two weeks after the labor negotiations ended.

Because the State of California relied upon its position that the MSAA violated the Sherman Act under the "per se" and quick look standards, the record is bereft of market analyses or an explanation of the actual anticompetitive effects of the MSAA. Although I share the majority's skepticism about the legitimacy of the grocery chains' contention that lowering labor costs by revenue-sharing to diminish any "whipsaw" tactics by the union would ultimately benefit customers in the form of lower prices,[2] the evidence of the actual anticompetitve effects of the agreement is, at best, in dispute.

As Justice Souter wrote in *California Dental*,

> The object is to see whether the experience of the
> market has been so clear, or necessarily will be, that
> a confident conclusion about the principal tendency
> of a restriction will follow from a quick (or at least

---

[2]The use of a revenue-sharing agreement in the context of multi-employer bargaining may in fact have a pro-competitive impact, but whether it is ethical and/or a practice that our country's labor laws should permit strikes me as a question best left to policymakers, not courts.

quicker) look, in place of a more sedulous one. And of course what we see may vary over time, if rule-of-reason analyses in case after case reach identical conclusions.

*California Dental*, 526 U.S. at 781. I agree with the district court that a "quick look" standard of review was thus inappropriate, in part because no case has addressed whether "a great likelihood of anticompetitive effects can be easily ascertained," *id.* at 770, in agreements such as this. I do not agree that whether the MSAA violates the Sherman Act is intuitively obvious; a more extended examination of the evidence is warranted. On this record, I am unable to reach a "confident conclusion that the principal tendency," *id.* at 781, of the arrangement at issue is to restrict competition so as to have an anticompetitive effect on customers and markets. Therefore I must dissent from the majority's holding on that question.